# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OMAR AGUILAR,             )
                                     )
           Plaintiff,         )
                                     )     No. 15 C 2952
       v.                   )
                                     )     Judge Sara L. Ellis
MICHAEL LEMKE, CHARLES F. BEST,  )
ANNA McBEE, TARRY WILLIAMS,     )
SERGEANT JOHNSON, LIEUTENANT    )
JENKINS, BRENNA GEORGE, SALVADOR )
GODINEZ, and KIM BUTLER,        )
                                     )
          Defendants.      )

## OPINION AND ORDER

Plaintiff Omar Aguilar, an inmate challenging his time in and the conditions he experienced while in segregation and restrictive confinement at Stateville Correctional Center ("Stateville"), brings suit against Defendants Michael Lemke, Charles F. Best, Anna McBee, Tarry Williams, Sergeant Johnson, Lieutenant Jenkins, Brenna George, Salvador Godinez, and Kim Butler pursuant to 42 U.S.C. § 1983.[1] Aguilar brings a claim for due process violations against Best, McBee, George, and Godinez (Count I);[2] a conditions of confinement claim against Lemke, Williams, Johnson, Jenkins, and Godinez (Count II); and a First Amendment free exercise of religion claim against Lemke, Williams, Johnson, Jenkins, and Godinez (Count III). Defendants Best, Godinez, and McBee have filed a motion to dismiss Aguilar's second amended

---

[1] The second amended complaint named Michael Melvin, the acting warden for Pontiac Correctional Center, as a nominal defendant in his official capacity. After Aguilar was transferred to Menard Correctional Center ("Menard"), Aguilar moved to substitute Kim Butler, the warden for Menard, in Melvin's place, Doc. 64, which the Court granted. Only Godinez, Best, McBee, and Williams have appeared in this case. A waiver of service for Lemke also appears on the docket. *See* Doc. 73.

[2] In his response to the motion to dismiss, Aguilar agrees to voluntarily dismiss Godinez from this claim.

complaint.[3]  Because the Court finds that Aguilar's claims all arise out of the same series of occurrences, the Court refuses to sever the conditions of confinement and religious exercise claims from the due process claim.  The Court also finds that Aguilar has sufficiently alleged the elements of his due process claim, leaving the factual determinations Best and McBee ask the Court to make for later proceedings.  Finally, the Court finds Aguilar has sufficiently alleged a systemic issue concerning the restriction of his religious activities so as to assert that claim against Godinez, the Illinois Department of Corrections ("IDOC") director at that time.

## BACKGROUND[4]

On February 15, 2013, members of Stateville's Internal Affairs unit conducted a cell search of two cells, E-711 and B-811.  They uncovered a handmade weapon—a shank—in a plumber's access area adjacent to the two cells.  Based on the discovery, they placed Aguilar, who lived in B-811, his cellmate, and the two inmates living in E-711 in temporary confinement under investigative status.  Aguilar maintains he did not have access to items in the plumber's access area and so could not remove the shank from it.

On February 18, Officer Milsap issued an investigative report, which did not specify Aguilar's behavior on February 15 or the reasons for placing him under investigative status. Aguilar also did not receive a shakedown receipt documenting the contraband found during the February 15 search, the circumstances of the shank's discovery, those present at the time of its discovery, and whether a disciplinary report was issued.  Aguilar remained in temporary

---

[3] The motion to dismiss seeks to dismiss the "third amended complaint."  Because Aguilar has not filed a third amended complaint, the Court presumes this to refer to the second amended complaint, Doc. 42, as amended by Aguilar's notice of voluntary dismissal of Count III of that complaint, Doc. 54.

[4] The facts in the background section are taken from Aguilar's second amended complaint and the exhibits referenced therein and are presumed true for the purpose of resolving the pending motion to dismiss.  *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

confinement under investigative status for 32 days without any written notice of the charges under investigation.

On March 14, Aguilar took a voice stress analyzer ("VSA") test. At the time he took the VSA test, he was under the care of a psychiatrist and taking Depakote and Zoloft for stress, anxiety, mood swings, and depression. Aguilar was asked four questions several times: "(1) Did you see your cellmate sharpen the shank? (2) Did you sharpen the shank on the bed? (3) Did you place the shank in the pipe chase? and (4) Was the shank yours?" Doc. 42 ¶ 25. Aguilar responded negatively to all four questions. The person administering the test told Aguilar that the first round of questioning was inconclusive. The VSA test results indicated Aguilar was truthful on the first two questions and deceptive on the last two questions.

On March 18, Aguilar received a disciplinary report charging him with "104: Dangerous Contraband" and "303: Giving False Information to an Employee." Doc. 42 ¶ 27. The report stated that the investigative unit found a shank in a plumber's access area between Aguilar's cell and the adjoining one and that scratch marks were found on the bottom metal bunk in Aguilar's cell. The report also included the VSA results, concluding the deceptive answers substantiated Aguilar's involvement. Correctional Officer Ricardo Tejeda signed as the reporting officer, even though he did not participate in the search of Aguilar's cell.

On March 29, Stateville's disciplinary board, chaired by Best and with George as a member, held a hearing on Aguilar's disciplinary report. Prior to the hearing, Aguilar wrote to J. Clements, a correctional officer, and the IDOC investigations unit requesting the name of the person who administered the VSA test and a copy of the VSA test result. He never received this information. Aguilar also asked to retake the VSA test, but that request was denied. At his disciplinary board hearing, Aguilar testified he did not know anything about the shank, that he

had been wrongfully held in investigative detention without receiving a disciplinary report, and that his taking psychiatric medication affected the reliability of the VSA test results. Aguilar asked to have three witnesses testify on his behalf. Although these witnesses testified, Aguilar was not present and so did not have the opportunity to ask them questions or submit questions for these witnesses to answer. These three witnesses testified that they heard scraping sounds in Aguilar's cell when the officers conducted the search of the cell on February 15. The disciplinary board found Aguilar guilty of both possessing dangerous contraband and giving false information to an employee, imposing a punishment of 6 months C grade, 6 months segregation, and 6 months commissary restriction. Lemke, then Stateville's warden, approved the disciplinary board's report on April 10.

Aguilar filed an emergency grievance on May 14 concerning the disciplinary hearing. The following day, he wrote Counselor Mansfield to ensure that his grievance was provided to the appropriate individual. Lemke denied that his grievance constituted an emergency and required that Aguilar submit it through the normal procedure. On July 22, Stateville grievance counselor Alex Hall instructed Aguilar to forward his grievance to a grievance officer for review, which Aguilar did. McBee, one of Stateville's grievance officers, reviewed Aguilar's request to expunge the disciplinary report from his record but upheld the disciplinary sanctions.

While in temporary confinement and then in segregation, Aguilar was housed in Stateville's F-House, also known as the Roundhouse. Aguilar could not make phone calls, could only have two non-contact visits per month, was limited to $30 per month in spending at the commissary, and had access to the yard only one time per week for five hours. During these five hours, Aguilar was placed in a small uncovered cage without access to a bathroom and with no respite from the elements. While inside, he was mainly restricted to his cell, could not attend

religious and recreational services, and, when allowed out of his cell, had to travel with a chain and handcuffs that locked around his waist and hands and have his feet shackled when stationary.

In November 2013, approximately a month after Aguilar was released from disciplinary segregation, Lemke, with oversight from Godinez, instituted a Weapons Violator/Staff Assaulter program, also known as the Black Stripe program. This program placed additional restrictions for a two-year period on those who, like Aguilar, had violated weapons rules or assaulted Stateville staff. Consequently, Aguilar moved back to F-House, had to wear a black and white striped jumpsuit, could not participate in work assignments, had to eat breakfast and dinner in his cell, had only five hours of recreation in the small yard per week, had no contact visits with his family, could not enroll in educational and recreational services, and could spend no more than $30 per month at the commissary. Aguilar also could not participate in religious services. Aguilar specifically complained about the denial of access to religious services in a grievance filed on March 29, 2015, but that grievance went unanswered.

In addition to these restrictions, Aguilar's cell in F-House was significantly smaller than that occupied by those in regular population, measuring approximately 4'9" by 10'6". Being in such a small space with another inmate for almost 24 hours each day caused Aguilar significant psychological issues. Due to its round shape, F-House is extremely noisy, making it difficult for Aguilar to sleep. Aguilar's cell had significant amounts of green and black mold on the walls of his cell, which he had difficulty cleaning without adequate cleaning supplies. He also encountered cockroaches, mice, and birds in his cell. Due to a hole in the ceiling, water leaked directly onto an electrical socket. Faulty plumbing meant that the toilet and sink in the cell did not always work. And because many cells, including Aguilar's, had broken windows, Aguilar faced extremely cold temperatures while in F-House. Exposure to these conditions caused

Aguilar to suffer abdominal pain and sinus and respiratory illnesses. Aguilar verbally

complained about these issues to Sergeant Johnson and Lieutenant Jenkins in August 2014, who

both worked shifts at F-House during that time. He also submitted an emergency grievance

report on September 3, 2014, which Williams, the warden at the time, denied, and then never

received a response from the assigned grievance counselor.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not

its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-

pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in

the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive

a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a

claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct.

1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.

Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.      Joinder of Claims

First, Godinez, Best, and McBee argue that Aguilar's complaint improperly joins claims

and parties. A plaintiff may join as many defendants in a single action as he wants as long as

"any right to relief is asserted against them jointly, severally, or in the alternative with respect to

or arising out of the same transaction, occurrence, or series of transactions or occurrences" and

"any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Unrelated claims against different defendants, however, should not be joined in the same lawsuit. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits[.]"). Rule 21 allows the Court to sever any claims against a party on its own or on a party's motion. Fed. R. Civ. P. 21.

Here, Aguilar's complaint asserts three claims: denial of due process against Best, George, and McBee (Count I); unconstitutional conditions of confinement against Lemke, Williams, Johnson, Jenkins, and Godinez (Count II); and violation of the free exercise of religion against Lemke, Williams, Johnson, Jenkins, and Godinez (Count IV). Godinez, Best, and McBee argue that the due process claim, which relates to Aguilar's initial placement in segregation, has no relationship to his remaining claims. But the Court disagrees; the conditions of confinement claims have a logical relationship to Aguilar's due process claim and judicial economy warrants allowing the claims to proceed together in one suit. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("[T]he impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."). Aguilar's initial claim—for denial of due process in connection with his disciplinary hearing—provides the basis for his remaining claims. Had it not been for that initial denial of due process, according to Aguilar, he would not have encountered the unsafe and unconstitutional conditions of confinement he challenges in Count II and would not have had his right to practice his Roman Catholic religion restricted, which he challenges in Count IV. These claims grow out of each other and so need not be separated. *See Cobb v. Fitch*, No. 14-cv-00605, 2015 WL 9315538, at *11 (N.D. Ill. Dec.

23, 2015) (finding claims properly joined where they all arose out of "Defendants' denial of Plaintiff's requests to see a specialist to treat his spine condition"); *Mays v. Chandler*, No. 15 C 50105, 2015 WL 8481976, at *3 (N.D. Ill. Dec. 10, 2015) (allowing claims to proceed together where plaintiff "sets forth a sequence of closely related events sharing the same root"); *Romero v. Atchison*, No. 15-cv-713, 2015 WL 7710372, at *4 (N.D. Ill. Nov. 30, 2015) (allowing due process and conditions of confinement claims to proceed together in same suit). Moreover, Godinez, Best, and McBee have not identified any difficulties in litigating the claims together or provided any compelling rationale for why the claims should be severed, for they are unable to argue that the events took place in different locations or at discrete periods of time. *See Romero*, 2015 WL 7710372, at *4 (noting that defendants had not identified any unfairness to them if claims were disposed of in one suit). Thus, the Court will allow the claims to proceed in the same suit and turns to considering the substantive challenges to Aguilar's claims.

## II.     Due Process Violation (Count I)

Best and McBee argue that the Court should dismiss Aguilar's due process claim because his placement in segregation, combined with the conditions of confinement while held there, do not trigger due process protections. Alternatively, they contend that Aguilar's complaint demonstrates that he received sufficient due process during his hearing.

Placement in disciplinary segregation triggers "due process protections depending on the duration and conditions of segregation." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009). A liberty interest in avoiding segregation arises "from a long term of confinement combined with atypical and significant hardships." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013). Six months of segregation standing alone has typically not sufficed to trigger a liberty interest, although the addition of "exceptionally harsh conditions" may give rise to such

an interest. *Id.* (citing *Marion*, 559 F.3d at 698). But the Seventh Circuit recently cautioned against a rigid focus on the mere length of confinement at the pleading stage. *See Kervin v. Barnes*, 787 F.3d 833, 836–37 (7th Cir. 2015) (finding that it was error "to suggest . . . that a prisoner must spend at least six months in segregation before he can complain of being deprived of liberty without due process of law" because "[a] considerably shorter period of segregation may, depending on the conditions of confinement and on any additional punishments, establish a violation" (citations omitted)); *see also Gillis v. Litscher*, 468 F.3d 488, 490–91, 495 (7th Cir. 2006) (reversing grant of summary judgment for defendants on due process claim where plaintiff alleged 12-day stint in behavior modification program in which he was denied clothing, bedding, and most personal items, sensory stimulation, and human contact).

Here, Aguilar faced six months in segregation in addition to two years in the Black Stripe program, which imposed similar conditions to segregation. He alleges that he could not make phone calls, had limited visits from friends and family, restricted commissary access, limited recreation time, and was exposed to unconstitutional living conditions. Although Best and McBee argue that Aguilar's allegations demonstrate that he endured merely the "normal restrictions placed on inmates in segregation," Doc. 60 at 7, the Court cannot make such a factual determination at the pleading stage. Instead, Aguilar's allegations suffice, at the pleading stage, to trigger a factual inquiry to determine whether Aguilar's liberty interest was implicated. *See Marion*, 559 F.3d at 698 ("[I]f the conditions of segregation were significantly harsher than those in the normal prison environment, 'then a year of [segregation] might count as a deprivation of liberty where a few days or even weeks might not.'" (alteration in original) (quoting *Bryan v. Duckworth*, 88 F.3d 431, 433 (7th Cir. 1996), *abrogated on other grounds*, *Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998))).

Alternatively, Best and McBee argue that Aguilar's due process claim fails because he received all the process he was due. "In the prison disciplinary context, due process requires only that the prisoner receive advance written notice of the charges, an opportunity to present testimony and documentary evidence to an impartial decision-maker, and a written explanation for the discipline that is supported by 'some evidence' in the record." *Piggie v. Cotton*, 342 F.3d 660, 662 (7th Cir. 2003) (citations omitted). Aguilar complains that he did not have the opportunity to call witnesses and present evidence, having been denied copies of the VSA report, the name of the person who administered the report, and the ability to call the three other inmates initially placed under investigation and question them himself. Best and McBee respond that Aguilar had no right to confront the witnesses directly, but Aguilar still had the right to submit questions for them prior to the hearing, which he claims did not occur. *See* 20 Ill. Admin. Code 504.80(h)(2). Aguilar also challenges whether the evidence relied on by the disciplinary board supported the discipline imposed, contending that the VSA was inconclusive and contradictory and, moreover, could not form the sole basis for a finding of guilt. *See* 20 Ill. Admin. Code 504.80(j)(2) ("Polygraph results may be considered but may not be the sole basis for finding the offender guilty of the offense."). Although the disciplinary board relied on other evidence as well, Aguilar claims that to have relied on the other evidence cited in the written statement, the board would have had to reject the VSA's conclusion, calling into question whether the written statement actually satisfied his due process rights. At this stage, taking Aguilar's allegations as true and drawing all inferences in his favor, the Court finds his allegations sufficient to allow his due process claim to proceed to discovery. *See Jacobo v. Holder*, No. 15-cv-0703-MJR-SCW, 2016 WL 5341197, at *4–5 (S.D. Ill. Sept. 23, 2016) (allowing due process claim to proceed where plaintiff alleged that he had been disciplined without an adequate basis).

## III. Godinez's Personal Involvement

Each Defendant sued in his individual capacity under § 1983 must have been personally involved in the alleged constitutional deprivation. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) ("In addition to the element of deliberate indifference, § 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim." (citations omitted)); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("[S]ome causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery."). A defendant may be personally liable "if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry*, 65 F.3d at 561 (alterations in original) (citations omitted) (internal quotation marks omitted); *see also Palmer*, 327 F.3d at 594 ("Although direct participation is not necessary, there must at least be a showing that the [defendant] acquiesced in some demonstrable way in the alleged constitutional violation.").

Godinez, the former IDOC director, argues that he should be dismissed as a Defendant with respect to Aguilar's free exercise of religion claim because Aguilar has not adequately alleged that Godinez had any personal involvement in allegedly restricting Aguilar's right to practice his Roman Catholic religion. Aguilar alleges that his access to religious services was curtailed because of his inclusion in the Black Stripe program, a jail-wide program instituted by Stateville's warden, Lemke, "with oversight from Defendant Godinez." Doc. 42 ¶ 44. Based on the systemic nature of the alleged deprivation, Aguilar's allegations suffice at this stage to allow his claim to proceed against Godinez. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996) (allowing claims to proceed against prison administrators that involved "potentially

systemic" and "not clearly localized" violations); *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981) (reversing dismissal of a hospital administrator from deliberate indifference claim because his position "justifies the inference at this stage of the proceeding that he does bear some responsibility for the alleged misconduct"); *Warren ex rel. Warren v. Dart*, No. 09 C 3512, 2010 WL 4883923, at *6 (N.D. Ill. Nov. 24, 2010) ("A senior jail official who was not personally involved in the acts or omissions complained of nonetheless may be liable in his individual capacity if he can be expected to have either known of or participated in creating systemic inadequate conditions at the jail.").

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants Best, Godinez, and McBee's motion to dismiss [55]. The Court dismisses Count I of the second amended complaint against Godinez.

Dated: January 5, 2017

_____
SARA L. ELLIS
United States District Judge